1

2

3

HONORABLE BENJAMIN H. SETTLE

4

5

6

7

8

MICHAEL E. MCFARLAND, JR., #23000
Evans, Craven & Lackie, P.S.
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632
Attorneys for Defendant

9

10

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

11

12

13

14

15

16

17

18

19

20

| | |
|---|---|
| T.K., individually, and as guardian for her daughter, G.G., a minor; B.G., individually; T.A., individually, and as guardian for his daughter, A.A., a minor; J.A., individually, K.W., individually, and as guardian for her daughter, P.W., a minor,<br><br>                                     Plaintiffs,<br><br>vs.<br><br>FREDERICK DAVID STANLEY, individually,<br><br>                                     Defendant. | Case No.  3:16-cv-05506-BHS<br><br>DEFENDANT'S MOTION TO DISMISS WITH PREJUDICE BASED UPON RES JUDICATA/CLAIM-SPLITTING<br><br>**Note on Motion Calendar: Friday, August 19, 2016** |

21

22

## I. INTRODUCTION

23

24

25

26

27

28

29

Plaintiffs T.K., individually and as guardian for her minor daughter G.G., B.G., individually, T.A., individually and as guardian for his minor daughter A.A., J.A., individually and as guardian for her minor daughter P.W., previously brought suit in Thurston County Superior Court against Olympia School District (OSD) and various OSD employees/administrators, including Defendant Frederick David Stanley. The state court

30

DEFENDANT'S MOTION TO DISMISS - page 1

action alleged harms arising out of the alleged sexual abuse of G.G., A.A. and P.W. by former OSD bus driver Gary Shafer.

On July 8, 2016, Thurston County Superior Court Judge Anne Hirsch granted the defendants' motion for summary judgment and dismissed the claims of the minor plaintiffs. Plaintiffs herein are the same plaintiffs in the state court action. In this lawsuit, they are seeking damages against former OSD Transportation Director Fred Stanley for alleged harm caused by the alleged sexual abuse of the minor plaintiffs by Mr. Shafer. As is set forth herein, Plaintiffs' claims for damages in this lawsuit arising out of the alleged sexual abuse are barred by the doctrine of res judicata. The law simply does not allow Plaintiffs to "claim split" and now pursue a claim in this Court alleging damages based upon the same set of operative facts as the state court litigation that has been dismissed. Summary dismissal of Plaintiffs' claims with prejudice is therefore proper.

## II. FACTS/PROCEDURAL HISTORY

On April 9, 2014, Plaintiffs filed suit in Thurston County Superior Court against Olympia School District and several current and former employees/administrators (*Tiffany Kelso, et.al. v. Olympia School District, et. al*., Thurston County Superior Court Cause No.14-2-00678-8). *See, Affidavit of Michael McFarland, Exhibit A*. On May 17, 2016, the defendants filed a motion for summary judgment. *Affidavit of Michael McFarland*. Defendants' motion was premised upon the argument that Plaintiffs could present no competent evidence that any of the minor plaintiffs had been sexually abused. *Id*. On July 8, 2016, Judge Ann Hirsch granted the defendants' motion. *Id*. On July 15, 2016, Judge Hirsch entered an order granting the defendants' motion for summary judgment and dismissing the "claims of minor Plaintiffs G.G., A.A., and P.W." *Affidavit of Michael McFarland, Exhibit B*.

DEFENDANT'S MOTION TO DISMISS - page 2

### III. LAW/ARGUMENT

Plaintiffs' Complaint in the state court action is attached as Exhibit A to the Affidavit of Michael McFarland. In that Complaint, Plaintiffs asserted four causes of action: (1) negligence; (2) gross negligence; (3) mandatory reporting failure under RCW 26.44.030; and (4) negligent infliction of emotional distress. *Affidavit of Michael McFarland, Exhibit A*. Those causes of action were premised upon the assertion that Mr. Shafer sexually abused minor plaintiffs G.G., A.A. and P.W. on an OSD bus. *Id.* The instant lawsuit is based upon the exact same facts and allegations as the state court action. The only difference between the state court action and the instant action is that Plaintiffs have asserted two causes of action (42 USC § 1983 and "Spoliation"[1]) in this lawsuit that were not asserted in the state court action. As set forth herein, that difference is immaterial and summary judgment based upon res judicata/claim splitting is proper.

**A.      Plaintiffs' Claims Are Barred By The Doctrine Of Res Judicata.**

Res judicata is a doctrine of claim preclusion that bars relitigation of a claim that has been determined by a final judgment. *Storti v. Univ. of Wash.,* 181 Wash.2d 28, 40–41, 330 P.3d 159 (2014). Filing two separate lawsuits based on the same event is precluded under Washington law. *Ensley v. Pitcher,* 152 Wash.App. 891, 898-99, 222 P.3d 99 (2009), *review denied,* 168 Wash.2d 1028, 230 P.3d 1060 (2010). "Res judicata applies to matters that were actually litigated and those that 'could have been raised, and in the exercise of reasonable diligence should have been raised, in the prior proceeding.'" *DeYoung v. Cenex Ltd.,* 100 Wash.App. 885, 891–92, 1 P.3d 587 (2000) (quoting *Kelly–Hansen v. Kelly–Hansen,* 87

---

[1] As set forth below, the plaintiffs did in fact allege spoliation in the state court action. They just did not identify it as a separate cause of action.

DEFENDANT'S MOTION TO DISMISS - page 3

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

Wash.App. 320, 328–29, 941 P.2d 1108 (1997)), *review denied,* 146 Wn.2d 1016 (2002). Res judicata is intended to prevent piecemeal litigation and to ensure the finality of judgments. *Spokane Research & Defense Fund v. City of Spokane,* 155 Wash.2d 89, 99, 117 P.3d 1117 (2005). The doctrine of res judicata promotes judicial economy, efficiency, and fairness to litigants. *Storti,* 181 Wash.2d at 40.

"'The doctrine of *res judicata* rests upon the ground that a matter which has been litigated, or on which there has been an opportunity to litigate, in a former action in a court of competent jurisdiction, should not be permitted to be litigated again. It puts an end to strife, produces certainty as to individual rights, and gives dignity and respect to judicial proceedings.'" *Marino Prop. Co. v. Port Comm'rs,* 97 Wash.2d 307, 312, 644 P.2d 1181 (1982) (quoting *Walsh v. Wolff,* 32 Wash.2d 285, 287, 201 P.2d 215 (1949)). "Filing two separate lawsuits based on the same event—claim splitting—is precluded in Washington." *Ensley v. Pitcher*, 152 Wash. App. at 898-99.

"The court looks to the law of the forum state—here Washington—to determine the preclusive effect of a state court judgment." *Zweber v. State Farm Mut. Auto. Ins. Co.*, 39 F. Supp. 3d 1161, 1165-66 (W.D. Wash. 2014), *citing Smith v. State Farm Mut. Auto. Ins. Co.,* 2013 WL 1499265, at 4 n. 1 (W.D.Wash. April 11, 2013) (citing *Manufactured Home Cmtys. Inc. v. City of San Jose,* 420 F.3d 1022, 1031 (9th Cir.2005)).

"Under Washington law, the doctrine of res judicata precludes so-called iclaim splitting.'" *Zweber* 39 F. Supp. 3d 1161, citing *Ensley v. Pitcher, supra*. "Claim splitting occurs when a party files two separate lawsuits based on the same events." *Id.* "The judicially created doctrine of res judicata rests upon the ground that a matter [that] has been litigated, or on which there has been an opportunity to litigate, in a former action in a court of competent

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

jurisdiction, should not be permitted to be litigated again. It puts an end to strife, produces certainty as to individual rights, and gives dignity and respect to judicial proceedings." *Smith,* 2013 WL 1499265, at 4 (quoting *Ensley,* 222 P.3d at 102) (quotation marks omitted). "Washington courts have explained that the 'general rule' is that if an action is brought for part of a claim, it must be brought for the whole claim, and a judgment obtained in the first action precludes the plaintiff from bringing successive actions for 'the residue of the claim.'" *Id.* (quoting *Karlberg v. Otten,* 167 Wash.App. 522, 280 P.3d 1123, 1130 (2012)). "Thus, all issues [that] might have been raised and determined are precluded." *Id.* (quoting *Feminist Women's Health Ctr. v. Codispoti,* 63 F.3d 863, 868 (9th Cir.1995)). "In Washington, res judicata is 'the rule, not the exception.'" *Id., citing Hisle v. Todd Pac. 1166 Shipyards Corp.,* 151 Wash.2d 853, 93 P.3d 108 (2004).

To determine whether res judicata applies, Washington courts apply a four-part test. *Karlberg,* 280 P.3d at 1130. In all instances, res judicata applies only if there is a final judgment on the merits. *Id.* (citing *Pederson v. Potter,* 103 Wash.App. 62, 11 P.3d 833, 835 (2000)). Assuming there is, that judgment will have preclusive effect if there is identity between the prior judgment and the subsequent action with respect to (1) persons and parties; (2) causes of action; (3) subject matter; and (4) the quality of persons for or against whom the claim was made. *Id.* Washington courts have applied these four factors in "a variety of ways," and "it is not necessary that all four factors favor preclusion to bar the claim." *Smith,* 2013 WL 1499265, at 4 (citing *Codispoti,* 63 F.3d at 868). Here, all four elements are met.

1.      **There Is Identity Of Parties**.

The state court action was brought by "Tiffany Kelso, individually, and as guardian for her daughter, G.G., a minor, Bronson Gouveia, individually; Todd Adams, individually, and as

DEFENDANT'S MOTION TO DISMISS - page 5

guardian for his daughter, A.A., a minor, Jennifer Adams, individually; Kristen Westlund, individually, and as guardian for her daughter, P.W., a minor." *Affidavit of Michael McFarland, Exhibit A*. The plaintiffs in this suit are "T.K., individually, and as guardian for her daughter, G.G., a minor, B.G., individually; T.A., individually, and as guardian for his daughter, A.A., a minor, J.A., individually; K.W., individually, and as guardian for her daughter, P.W., a minor." *ECF 1, pg. 1*. The plaintiffs in the two suits are identical.

Frederick Stanley was a defendant in the state court action and is named as a defendant herein. The defendants are identical. Defendant Fred Stanley was the "District's former Transportation Director." *ECF 1, pg. 6, Par. 19*. There is identity of parties.

    **2.**    **There Is Identity Of Subject Matter**.

Even a cursory review of the two complaints establishes the identity of the subject matter in the two lawsuits. In both cases, the "subject matter" is the alleged failure of OSD and its administrators, including Mr. Stanley, to protect the minor plaintiffs from the alleged abuse by Mr. Shafer. Regardless of the causes of action asserted (see below), it cannot be logically denied by Plaintiffs that the subject matter of both suits is identical. As set forth below, the Complaint in this matter is nearly identical to the one filed in Thurston County Superior Court, with many paragraphs being repeated word for word. Sometimes the paragraphs have been altered slightly and in some instances additional factual information is included. However, both lawsuits seek damages based upon the identical premise: That the alleged actions and inactions of Mr. Stanley gave Mr. Shafer access to the minor plaintiffs, and that with that access, Mr. Shafer sexually abused the plaintiffs.

Mr. Stanley will not identify herein every single factual assertion that is identical in the two complaints. However, for ease of the Court's reference, Mr. Stanley provides the

DEFENDANT'S MOTION TO DISMISS – page 6

following chart, which compares many of the allegations made in the state court action with the corresponding allegations from the Complaint in this matter. As noted, some paragraphs are identical, while others have been modified slightly to add additional factual background. The bottom line, however, is that the subject matter of both lawsuits is the alleged sexual abuse allegedly perpetrated by Mr. Shafer on the minor plaintiffs, which Plaintiffs allege is the result of the actions and inactions of Mr. Stanley.

| Complaint in *Kelso. v. Olympia School District*, Thurston County Superior Court Cause No.14-2-00678-8 | Complaint in *T.K. v. Olympia School District*, Western District of Washington, 3:16-cv-05506-BHS |
|---|---|
| Within days of learning that Shafer had been arrested, Stephen Kern, an Olympia School District bus driver and friend of Gary Shafer, reported to his two bosses that he felt concerned Shafer may have molested kindergarten student P.W. while Shafer rode along on multiple occasions in the midday kindergarten bus Mr. Kern drove. **Paragraph 1.2** | Within days of learning that Shafer had been arrested, Stephen Kern, an Olympia School District bus driver and friend of Gary Shafer, reported to Fred Stanley and his training director, Barbra Greer, that he felt concerned Shafer may have molested kindergarten student P.W. while Shafer rode along on multiple occasions in the midday kindergarten bus Mr. Kern drove. **Paragraph 9** |
| To summarize the testimony above, Stephen Kern originally was told by his district superiors that they would follow up on his report about potential abuse of P.W. Two weeks went by and Stephen Kern heard nothing from his supervisors. He was concerned that the child had been molested. He wanted to learn about her welfare. He returned to confront training director Barbara Greer about the report he made concerning P.W. Greer told Stephen Kern that the child and her family had left the school and there was nothing that could be done. P.W. and her family never left the Olympia School District. She continuously remained a student in the same school throughout elementary school. | Stephen Kern originally was told by his district superiors that they would follow up on his report about potential abuse of P.W. Two weeks went by and Stephen Kern heard nothing from his supervisors. He was concerned that the child had been molested. He wanted to learn about her welfare. He returned to confront training director Barbara Greer about the report he made concerning P.W. Greer told Stephen Kern that the child and her family had left the school and there was nothing that could be done. P.W. and her family never left the Olympia School District. She continuously remained a student in the same school throughout elementary school. **Paragraph 9** |

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

| **Paragraph 1.3** | |
|---|---|
| The story begins with what the District knew or should have known about Gary Shafer. The District hired Shafer as bus driver in 2005. During his interview, he said that he would make a good bus driver because he "love[d] of children" and because he "like[s] being around kids." His goal was to "get to know the kids." When asked whether he was prepared to accept the responsibility for the lives of the students on the bus, he said, "yes, kind of scary." **Paragraph 4.2** | During his interview, he said that he would make a good bus driver because he "love[s] [] children" and because he "like[s] being around kids." His goal was to "get to know the kids." When asked whether he was prepared to accept the responsibility for the lives of the students on the bus, he said, "yes, kind of scary." **Paragraph 22** |
| Beginning right away, Shafer started asking Transportation Director Fred Stanley whether he could spend all of his free time riding along with other drivers on their midday kindergarten and special needs routes because he liked being around the kids so much. Stanley gave Shafer blanket permission to ride along, later claiming that he never had reason to distrust Shafer's motivations for wanting to ride along with the vulnerable children. Stanley never assigned Shafer to these rides, never checked on what he was doing on these rides, never kept track of how often or with whom he was riding, and never spoke to any driver about what Shafer was doing during these ride alongs. Furthermore, the District never paid Shafer for the ride alongs or for helping to manage the kindergarten and special needs passengers; instead, the District allowed Shafer to do it because they never created a policy prohibiting it.<br>**Paragraph 4.3** | Beginning right away, Shafer asked Defendant Stanley whether he could volunteer to ride along with other drivers on their midday kindergarten, pre-kindergarten, and special needs routes because he liked being around the kids so much, especially the District's most vulnerable. Stanley gave Shafer permission to ride along, and then by permission and acquiescing, gave Shafer complete authorization for his ride alongs, later claiming that he never had reason to distrust Shafer's motivations for wanting to ride along with the vulnerable children. Under Stanley's blanket permission, Shafer was able to ride along on hundreds of school buses whenever and wherever he wanted. Stanley never assigned Shafer to these rides, never checked on what he was doing on these rides, never kept track of how often or with whom he was riding, and never spoke to any driver about what Shafer was doing during these ride alongs. Furthermore, Shafer was never paid for his hundreds of ride alongs or for helping to manage the kindergarten, pre-kindergarten, and special needs passengers; instead, the Stanley allowed Shafer to do it because he was deliberately indifferent to the danger he |

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

| | created in doing. **Paragraph 23** |
|---|---|
| In an effort to coordinate his access to young girls, Shafer would use the ride alongs to identify kindergarten girl targets on the buses, switching his assigned bus route at least 18 known times to isolate certain girls. Shafer would pull the bus over or arrive at stops early so that he would have down time with the girls. He also took full advantage of Defendant Stanley's "open door" ride along policy to access the young girls on other drivers' kindergarten, pre-kindergarten, and special needs routes. **Paragraph 4.4** | In an effort to coordinate his access to young girls, Shafer used several tactics. He would use the ride alongs to identify his targets among the kindergarten, pre-route or keep riding along with his victims on buses being driven by other drivers who would allow him as an unauthorized guest. Shafer frequently and often abruptly changed his driving assignments, either looking for victims or escaping potential problems he created by molesting children on his buses. . . . He took full advantage of Defendant Stanley's "open door" ride along policy that directly created the danger of allowing him to access the young girls on other drivers' kindergarten, prekindergarten, and special needs routes. **Paragraph 27** |
| In the fall of 2006, Shafer went on "sub status" as a bus driver with the District because he left for a higher-paying job as a long haul trucker. As he told many bus drivers, he was having financial problems and needed more money. Even though he successfully completed the trucking program at the top of his class, Shafer left the trucking work immediately and returned to the bus barn to work part-time for the District. In Shafer's own words, "I was going to be doing long haul truck driving starting last winter but I decided not to for various reasons even though it would have been a lot of money." **Paragraph 4.5** | Shafer had been driving his assigned route when, in November 2006, he suddenly put in for a route change and then announced that he would be leaving for a higher-paying job as a long-haul trucker. He told many bus drivers that he was having financial problems and needed more money. The reality was that he abruptly changed from a special needs bus route because over concerns over getting caught for sexual abuse. Even though he successfully completed the trucking program at the top of his class, Shafer left the trucking work immediately and returned to the bus barn to work part-time for the District. In Shafer's own words, "I was going to be doing long haul truck driving starting last winter but I decided not to for various reasons even though it would have been a lot of money." **Paragraph 28** |

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

| | |
|---|---|
| When confronted by a fellow bus driver about why he left his long haul trucking job despite his money woes, Shafer told his co-workers that he returned as a part-time school bus driver because he missed contact with children. From this incident and others, Shafer's fellow bus drivers found him very strange and unusually interested in children. He was being described as "odd" by at least one school counselor and was reportedly observed viewing child pornography on a bus barn computer by a fellow driver. Shafer has also admitted and has been seen by other bus drivers pulling his bus over to the side of the road or in parking lots for no apparent reason. **Paragraph 4.6** | When confronted by a fellow bus driver about why he left his long haul trucking job despite his money woes, Shafer told his co-workers that he returned as a part-time school bus driver because he missed contact with children. From this incident and others, Shafer's fellow bus drivers found him very strange and unusually interested in children. He was being described as "odd" by at least one school counselor and was reportedly observed viewing child pornography on a bus barn computer by a fellow driver. Shafer has also admitted and has been seen by other bus drivers pulling his bus over to the side of the road or in parking lots for no apparent reason. At least one driver raised concerns with the administrative office about Shafer being parked for no apparent reason during a route. Even Defendant Stanley himself has admitted that he confronted Shafer about pulling over his buses for no reason. **Paragraph 29** |
| In the fall of 2009, McLane Elementary School bus driver Karen Nelson became ill and the District used sub drivers to cover the route. Shafer began targeting kindergarten girls for abuse on the route by riding along with various sub drivers. He also drove the bus as a substitute bus driver. On one occasion that he was driving, Shafer dropped off a young girl who as so shaken by the experience that she told her dad, Kevin Gearheart, that she never wanted to ride the bus again. **Paragraph 4.7** | In the fall of 2009, McLane Elementary School bus driver Karen Nelson became ill and the District used sub drivers to cover the route. Shafer began targeting kindergarten girls for abuse on the route by riding along with various sub drivers. He also drove the bus as a substitute bus driver. On one occasion that he was driving, Shafer dropped off a young girl who as so shaken by the experience that she told her dad, Kevin Gearheart, that she never wanted to ride the bus again. **Paragraph 31** |
| Mr. Gearheart called the District Transportation Department about concerns that a male substitute driver was dropping his kindergarten daughter off alone, a half-hour late, and so traumatized that she refused to ride the bus any longer. Despite the | Mr. Gearheart called the District Transportation Department about concerns that a male substitute driver was dropping his kindergarten daughter off alone, a half-hour late, and so traumatized that she refused to ride the bus any longer. Despite the father's |

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

| | |
|---|---|
| father's deep concerns and repeated calls, the District downplayed any potential for wrongdoing and performed no investigation; it simply reiterated that all bus drivers receive background checks, and therefore, there was no need to do anything further. Tragically, after Shafer's molestation surfaced in 2011, Mr. Gearheart immediately recognized Shafer's face as the driver who had left his daughter traumatized from the bus. He confronted the District about Shafer's presence on the bus, but the District lied and said that Shafer never drove that bus. **Paragraph 4.8** | deep concerns and repeated calls, the District downplayed any potential for wrongdoing and performed no investigation; it simply reiterated that all bus drivers receive background checks, and therefore, there was no need to do anything further. Tragically, after Shafer's molestation surfaced in 2011, Mr. Gearheart immediately recognized Shafer's face as the driver who had left his daughter traumatized from the bus. He confronted the District about Shafer's presence on the bus, but the District lied and said that Shafer never drove that bus. **Paragraph 32** |
| District employees discussed these "red flags" but nothing was done to monitor or investigate Shafer. By disregarding Shafer's obsessive fixation on routes for kindergarten children and other vulnerable students, the District failed to ensure that Shafer was acting appropriately and that children were safe in his presence. **Paragraph 4.9** | District employees discussed these "red flags" but nothing was done to monitor or investigate Shafer. By ignoring evidence that Shafer was acting inappropriately, including actual reports that Shafer was inappropriately touching and otherwise engaging in peer-to-peer activities with children on the school bus, commonly known as sexual grooming, as well as ignoring evidence of Shafer's obsessive fixation on routes for kindergarten, pre-kindergarten, and special needs children, the District acted with deliberate indifference toward the safety of children in its custody and control, including Plaintiffs G.G., A.A., and P.W. **Paragraph 33** |
| In late December 2010, the Thurston County Sheriff's Department received a report that Olympia School District bus driver Gary D. Shafer sexually assaulted a kindergarten girl on a bus driven by fellow bus driver Mario Paz. Shafer was riding along with Paz to "learn the route" and had the kindergarten girl in his lap while seated behind the driver. **Paragraph 4.11** | In late December 2010, the Thurston County Sheriffs Department received a report that Olympia School District bus driver Gary D. Shafer sexually assaulted a kindergarten girl named N.L. on a bus driven by fellow bus driver Mario Paz. Shafer was riding along with Paz to "learn the route" and had the kindergarten girl in his lap while seated behind the driver. Shafer sexually abused N.L. while she was in his lap, and N.L. |

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

| | disclosed the abuse to her mother, who in turn contacted the District. **Paragraph 34** |
|---|---|
| Shafer admitted to pulling his own buses to the side of the road to molest young girls on his bus; Shafer admitted to detaining young girls in his bus after arriving to destinations early; Shafer admitted to accessing pornography on the District bus barn's computers on a regular basis without the District ever tracking, logging, or confronting him about it; Shafer admitted to masturbating in the bus barn and on the busses; and finally, Shafer admitted to photographing, videotaping, and sexually assaulting up to 30 young District students while working in his capacity as an Olympia School District bus driver. **Paragraph 4.12** | Shafer admitted to pulling his own buses to the side of the road to molest young girls on his bus; Shafer admitted to detaining young girls in his bus after arriving to destinations early; Shafer admitted to accessing pornography on the District bus barn's computers on a regular basis without the District ever tracking, logging, or confronting him about it; Shafer admitted to masturbating in the bus barn and on the busses; and finally, Shafer admitted to photographing, videotaping, and sexually assaulting up to 30 young District students while working in his capacity as an Olympia School District bus driver. **Paragraph 35** |
| On May 5, 2011, Thurston County Sheriff's Office interviewed Gary Shafer after receiving information that he had sexually assaulted a young girl at Garfield Elementary School who was approximately 5 or 6 years old. This was G.G.'s friend T.C. **Paragraph 4.13** | On May 5, 2011, Thurston County Sheriffs Office interviewed Gary Shafer after receiving information that he had sexually assaulted a young girl at Garfield Elementary School who was approximately 5 or 6 years old. This was G.G.'s friend T.C. **Paragraph 36** |
| T.C.'s mother reported to Garfield Elementary School's Principal Bob Hodges that her daughter disclosed that G.G. was also a victim of Gary Shafer. Bob Hodges advised T.C.'s mother that he would "take it from here." Nothing was ever reported to authorities about these concerns. **Paragraph 4.14** | T.C.'s mother reported to Garfield Elementary School's Principal Bob Hodges that her daughter disclosed that G.G. was also a victim of Gary Shafer. Bob Hodges advised T.C.'s mother that he would "take it from here." Nothing was ever reported to authorities about these concerns. Nothing was done by Stanley to collect or preserve evidence. **Paragraph 36** |
| The District's Transportation Director, Fred Stanley, recently claimed that "[t]here's no reason for a bus driver not to sit with children. . . . We hire good people and everybody has been background checked and we have no reason not to trust our | Stanley has repeatedly testified that he had "no reason to be looking" at what Shafer was doing because he "trusted" all of his drivers for having passed a background check. **Paragraph 26** |

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

| | |
|---|---|
| employees." **Paragraph 4.15** | |
| District failed to properly train its employees on how to recognize obvious signs that Shafer was using school buses to molest young vulnerable girls. **Paragraph 4.18** | Defendant Stanley failed to properly train his employees on how to recognize obvious signs that Shafer was using school buses to molest young vulnerable girls. **Paragraph 41** |
| The District brushed aside the importance of training school employees on understanding that a molester's best camouflage is our unwillingness to see him. According to leading commentators, accepting that molesters may lurk in our midst is crucial to preventing child abuse:<br><br>Many educators do not believe that a colleague could sexually exploit a student. They believe that if such abuse happens, it happens in some other community and it is so rare and idiosyncratic that it does not warrant attention. Many believe that educators already know they should not have sexual relationships with students. Consequently, some are insulted when they are required to attend training on this issue. Unfortunately, it is just such attitudes that have created the educational climate that allows sexual abuse to continue.<br><br>Shoop at 63. By failing to properly train employees, the District created a climate that allowed Shafer's sexual abuse to continue. **Paragraph 4.18** | Defendant Stanley brushed aside the importance of training school employees on understanding that a molester's best camouflage is a school district's unwillingness to see him This is particularly alarming in light of the research of leading commentators, who teach that accepting that molesters may lurk in our midst is crucial to preventing child abuse:<br><br>Many educators do not believe that a colleague could sexually exploit a student. They believe that if such abuse happens, it happens in some other community and it is so rare and idiosyncratic that it does not warrant attention. Many believe that educators already know they should not have sexual relationships with students. Consequently, some are insulted when they are required to attend training on this issue. Unfortunately, it is just such attitudes that have created the educational climate that allows sexual abuse to continue.<br><br>Shoop at 63. By failing to properly train employees, the District and the individually named defendants herein who were responsible for training drivers created a climate that allowed Shafer's sexual abuse to continue. **Paragraph 42** |
| When the factual verifications of Shafer's molestations began circulating, Transportation Department Director Fred Stanley refused to entertain the possibility that Shafer would have molested the children and sent a chilling threat to the bus drivers: | When the factual verifications of Shafer's molestations began circulating, and people began to push for answers as to how it all happened, Defendant Stanley refused to entertain the possibility that Shafer would have molested the children and sent a chilling |

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

| | |
|---|---|
| These rumors [about Shafer] are slanderous and the people spreading them and I feel should be charged with a crime and prosecuted to the fullest extent of the law. If you are one of those spreading this information and I hear it, I will report it to the proper authorities and I want to encourage those that have told me they are highly offended by this kind of behavior to do the same. **Paragraph 4.19** | threat to the bus drivers:<br><br>These rumors [about Shafer] are slanderous and the people spreading them could and I feel should be charged with a crime and prosecuted to the fullest extent of the law. If you are one of those spreading this information and I hear it, I want to encourage those that have told me they are highly offended by this kind of behavior to do the same. **Paragraph 40** |
| The District's employees did not receive crucial training on how to spot molesters. District administrators received "boundary invasion" training in the spring of 2010, which taught about the significant danger of school personnel molesting children and included statistics about the specific danger presented by bus drivers. Despite the considerable value in this training, District officials became deeply offended by the notion that District might include child predators. District officials thought that the presentation was "negative" and refused to train District employees on the subject of boundary invasions. **Paragraph 4.20** | The District's employees did not receive crucial training on how to spot molesters. District administrators received "boundary invasion" training in the spring of 2010, which taught about the significant danger of school personnel molesting children and included statistics about the specific danger presented by bus drivers. Despite the considerable value in this training, as former superintendent William Lahmann acknowledged, District officials became deeply offended by the notion that District might include child predators. District officials thought that the presentation was "negative" and refused to train District employees on the subject of boundary invasions. **Paragraph 44** |
| Even since Shafer's pandemic molestation surfaced, the District disregarded and disputed many of the facts that should have prompted full internal investigations and reports. A large discrepancy, for example, exists between Mario Paz's and Shafer's recollection of how many times Shafer would ride Paz's bus to "learn the route." Paz has repeatedly asserted that Shafer only rode his bus three times, even though Shafer told investigators that he was on the bus | The Olympia School District and its bus driver, Mario Paz, claimed over the next two years that Gary Shafer had ridden along as an unauthorized passenger on only "two or three occasions." When confronted under oath in prison, Shafer revealed he actually rode the bus driven by Mario Paz upwards of 20 times. **Paragraph 38** |

DEFENDANT'S MOTION TO DISMISS - page 14

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

| | |
|---|---|
| throughout the fall and early winter of 2010. Recently, Shafer stated that he rode on Paz's bus regularly from October 2010 through December 2010. **Paragraph 4.21** | |
| Despite clear evidence of significant sexual abuse by Shafer, the District has made absolutely no effort to locate and identify 30 or more other children who were sexually abused on its school buses. **Paragraph 4.22** | Despite clear evidence of significant sexual abuse by Shafer, the District and its agents, including Defendant Stanley, has made little effort to locate and identify 30 or more other children who were sexually abused on its school buses. **Paragraph 45** |
| Bus driver Stephen Kern testified in 2013 that he observed Gary Shafer sitting next to P.W. on multiple bus rides during occasions where Shafer volunteered to ride along on Mr. Kern's bus. Mr. Kern knew that Shafer's presence next to P.W. on the seat was altering her behavior from extremely outgoing to unusually quiet. When Mr. Kern learned that Shafer was reported to have molested other kindergarten girls on buses, Mr. Kern immediately alerted bus administrators that he was concerned Shafer had molested P.W. No administrator ever reported this concern. A few weeks after Mr. Kern first reported his concern that Shafer may have abused P.W., he followed up with administrators, but was told that P.W. had moved out of the District and that there was nothing they could do to get in contact with her parents to inform them of Mr. Kern's concern. This was a false statement and a knowing cover-up of a potential child sexual abuse incident. The family did not move out of the District and P.W. attended Garfield Elementary School continuously since kindergarten. **Paragraph4.24** | Bus driver Stephen Kern testified in 2013 that he observed Gary Shafer sitting next to P.W. on multiple bus rides during occasions where Shafer volunteered to ride along on Mr. Kern's bus. Mr. Kern knew that Shafer's presence next to P.W. on the seat was altering her behavior from extremely outgoing to unusually quiet. When Mr. Kern learned that Shafer was reported to have molested other kindergarten girls on buses, Mr. Kern immediately alerted Defendant Stanley and Geer that he was concerned Shafer had molested P.W. Stanley failed to report this concern. A few weeks after Mr. Kern first reported his concern that Shafer may have abused P.W., he followed up with administrators, but was told that P.W. had moved out of the District and that there was nothing they could do to get in contact with her parents to inform them of Mr. Kern's concern. This was a false statement and a knowing cover-up of a potential child sexual abuse incident. The family did not move out of the District and P.W. attended Garfield Elementary School continuously since kindergarten. **Paragraph 37** |

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

Causes of action are identical for res judicata if (1) prosecution of the later action would impair the rights established in the earlier action, (2) the evidence in both actions is substantially the same, (3) infringement of the same right is alleged in both actions, and (4) the actions arise out of the same nucleus of facts. *Spokane Cty. v. Miotke*, 158 Wash. App. 62, 67, 240 P.3d 811 (2010). Here, Plaintiffs' claims for damages arising from the alleged sexual abuse of the minor plaintiffs by Mr. Shafer were dismissed by the Thurston County Superior Court. Prosecuting this lawsuit would impair the rights established in the state court action. In addition, the evidence in both actions is not just "substantially the same," it is identical. While Plaintiffs have a different, and higher, burden of proof to establish their federal cause of action, the evidence upon which they would rely to attempt to establish liability is identical to the evidence in the Thurston County case. The two lawsuits arise out of the exact same nucleus of facts and involve the identical alleged infringement of the same right (the alleged sexual abuse of the minor plaintiffs). The subject matter of the two lawsuits is identical. Plaintiffs will not identify any differences in the subject matter of the two suits.

**3.     There is Identity Of Causes Of Action.**

It is anticipated that Plaintiffs will argue that res judicata is inapplicable because the causes of action in the two suits are different. Such an argument is unpersuasive, as case law makes it clear that Plaintiffs are precluded from pursuing any claim they could have brought in the state court action. Res judicata refers to "the preclusive effect of judgments, including the relitigation of claims and issues that were litigated, or might have been litigated, in a prior action." *Loveridge v. Fred Meyer, Inc.*, 125 Wash. 2d 759, 763, 887 P.2d 898 (1995).

> Claim-splitting is prohibited by the doctrine of res judicata, which bars parties to a prior action or those in privity with them from raising in a subsequent proceeding any claim they could have

DEFENDANT'S MOTION TO DISMISS - page 16

raised in the prior one, where all the claims arise from a common nucleus of operative facts.

*O'Dell v. Conseco Senior Health Ins. Co.*, No. C08-00793 RSL, 2011 WL 13044240, at 4 (W.D. Wash. Feb. 10, 2011), *citing Adams v. Cal. Dep't of Health Servs.,* 487 F.3d 684, 689 (9th Cir.2007); *Enslev v. Pitcher, supra*.

> *Res judicata* estops parties from relitigating claims under a different legal theory and subsequently filing suit. All issues that could have been raised in a prior suit are precluded, even if the claims were not actually litigated. As such, *res judicata* prevents claim-splitting; a plaintiff may not file a lawsuit under a new legal theory seeking new legal remedies for a claim that could have been raised in a prior action.

*Peterson v. sanofi-aventis U.S. LLC*, No. CV-12-202-LRS, 2012 WL 2880883, at 2 (E.D. Wash. July 13, 2012)

In *Hyytinen v. Morhous*, No. C14-5537 BHS, 2015 WL 917621 (W.D. Wash. Mar. 3, 2015), the Court noted: "The general rule is that if an action is brought for part of a claim, a judgment obtained in the action precludes the plaintiff from bringing a second action for the residue of the claim. Thus, 'all issues which might have been raised and determined are precluded.'" *Hyytinen v. Morhous*, at 4, *citing Karlberg v. Otten,* 167 Wash.App. 522, 535, 280 P.3d 1123 (2012) and *Shoemaker v. City of Bremerton,* 109 Wash.2d 504, 507, 745 P.2d 858 (1987). In *Hyytinen v. Morhous*, the plaintiff (Hyytinen) filed suit in state court (Kitsap County Superior Court) against the Washington State Patrol and the City of Bremerton, alleging that the WSP violated his federal due process rights and acted negligently when it seized his vehicle. The trial court dismissed Hyytinen's claims against WSP. After an unsuccessful appeal, Hyytinen filed suit in federal court against the Washington State Patrol trooper (Morhous) involved in the seizure of the vehicle, alleging a violation of 42 U.S.C. §

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632

1983. In granting summary judgment, the Court noted that "section 1983 does not override state preclusion law." *Hyytinen v. Morhous,* at 3, *citing Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 85, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). The Court therefore concluded that the causes of action are "identical." *Id.*

In the instant case, Plaintiffs can offer no reason why the 42 U.S.C. § 1983 and "spoliation" claims could not have been brought as part of the state court litigation.[2] Case law precludes Plaintiffs' attempt to split their claims. "Filing two separate lawsuits based on the same event—claim splitting—is precluded in Washington." *Landry v. Luscher,* 95 Wash.App. 779, 780, 976 P.2d 1274 (1999).

**4.      There Is Identity In Quality Of The Persons For Or Against Whom The Claim Is Made**.

The relationship between Plaintiffs and Mr. Stanley was and is adversarial in both proceedings. This satisfies this element of res judicata. *See*, *Landry v. Luscher*, 95 Wash. App. 779, 785, 976 P.2d 1274 (1999), *citing Bordeaux v. Ingersoll Rand Co.,* 71 Wash.2d 392, 397-98, 429 P.2d 207 (1967) ("Again the Luschers were identified as the defendants and the Landrys were identified as the plaintiffs in both actions. The relationship between the Luschers and the Landrys was adversarial in both proceedings. These actions met the requirements of res judicata").

\*\*\*

Plaintiffs have had their day in court as it relates to the alleged harm to the minor plaintiffs arising from the alleged sexual abuse by Mr. Shafer. They presented evidence to

---

[2] Technically, Plaintiffs' state court claim of "Mandatory Reporting Failure Under RCW 26.44.030 is a claim for "spoliation." In fact, Plaintiffs specifically alleged that the claimed "failure to report" "resulted in a spoliation of the evidence." Affidavit of Michael McFarland, Exhibit A, pg. 18, line 5.

DEFENDANT'S MOTION TO DISMISS - page 18

Judge Hirsch in opposition to the defendants' motion for summary judgment. Judge Hirsch rejected that evidence and dismissed the minors' claims for damages arising out of the alleged sexual abuse. The law precludes a plaintiff dissatisfied with the results of litigation to simply pursue the litigation in a different court by simply asserting different causes of action. This is a classic case of prohibited "claim splitting." The Court should reject Plaintiffs' efforts to get the proverbial two bites at the apple and should dismiss this litigation.

**B.      Defendants Should Be Awarded Their Attorneys Fees And Costs**.

Under RCW 4.84.185, the Court may award attorney's fees upon a finding that the lawsuit was "frivolous and advanced without reasonable cause...." RCW 4.84.185. "A lawsuit is frivolous when it cannot be supported by any rational argument on the law or facts." *Tiger Oil Corp. v. Dep't of Licensing,* 88 Wash.App. 925, 938, 946 P.2d 1235 (1997). Having lost in state court based upon the identical facts, Plaintiffs' lawsuit in this Court is frivolous. *Hyytinen v. Morhous*, 2015 WL 917621, at 5 (W.D. Wash. Mar. 3, 2015) ("Here, the Court finds that Hyytinen's claims against Morhous are frivolous and advanced without reasonable cause. Hyytinen filed two separate lawsuits based on the same events. As discussed above, the doctrine of res judicata precludes such claim splitting").

## IV. CONCLUSION

The law prohibits claim splitting. Plaintiffs have already unsuccessfully litigated their claims against Mr. Stanley. They are not entitled to seek herein what the Thurston County Superior Court has already rejected. The Court should therefore grant Mr. Stanley's motion and dismiss Plaintiffs' claims with prejudice. The Court should also award Mr. Stanley his costs and fees incurred in bringing this motion.

DEFENDANT'S MOTION TO DISMISS - page 19

1

DATED this 25th day of July, 2016.

2

EVANS, CRAVEN & LACKIE, P.S.

3

4

By:    s/   Michael E. McFarland, Jr.

5

Michael E. McFarland, Jr., #23000

6

Attorneys for Defendant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

DEFENDANT'S MOTION TO DISMISS – page 20

1

**CERTIFICATE OF SERVICE**

2

3        I hereby certify that on July 25, 2016, I electronically filed the foregoing with the Clerk

4    of the Court using the CM/ECF System which will send notification of such filing to the

5    following:

Darrell L. Cochran
6    Kevin Hastings
Pfau, Cochran, Vertetis, Amala
7    911 Pacific Avenue, Suite 200
8    Tacoma, WA  98402
email:  Darrell@pcvalaw.com
9    email:        kevin@pcvalaw.com
10   email:  laura@pcvalaw.com

11   Jerry Moberg
12   Jerry Moberg & Associates, P.S.
124 3rd Avenue SW
13   P.O. Box 130
14   Ephrata, WA  98823
Email:        jmoberg@jmlawps.com
15   Email:        mrathbone@jmlawps.com

16

17                                    EVANS, CRAVEN & LACKIE, P.S.

18                      By:    s/    Michael E. McFarland, Jr.
19                             MICHAEL E. McFARLAND, #23000
Attorney for Defendants
20                             Evans, Craven & Lackie, P.S.
818 W. Riverside Ave., Suite 250
21                             Spokane, Washington  99201
(509) 455-5200
22                             (509) 455-3632 Facsimile
23                             MMcFarland@ecl-law.com

24

25

26

27

28

29

30

DEFENDANT'S MOTION TO DISMISS – page 21

*Evans, Craven & Lackie, P.S.*
818 W. Riverside, Suite 250
Spokane, WA 99201-0910
(509) 455-5200; fax (509) 455-3632